**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Sematic USA, Inc.,** | ) | **CASE NO. 04 CV 2400** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Otis Elevator Company,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |


**INTRODUCTION**

This matter is before the Court upon Plaintiff Sematic USA, Inc. d/b/a Tyler Elevator

Products' Motion for Summary Judgment (Doc. 23).  Also pending is Defendant Otis Elevator

Company's Motion for Partial Summary Judgment (Doc. 45).  This case involves a dispute over

the manufacture of elevator component parts by plaintiff for defendant.  For the reasons that

follow, plaintiff's motion is GRANTED in PART and DENIED in PART and defendant's

motion is GRANTED.

**FACTS**

Plaintiff, Sematic USA, Inc. d/b/a Tyler Elevator Products, brings this lawsuit against

1

defendant, Otis Elevator Company, seeking payment under the contract between the parties.

Plaintiff manufactures elevator component parts.  Defendant manufactures, installs and maintains elevators on behalf of various entities throughout the United States.  Defendant entered into an agreement with Walt Disney Imagineering ("Disney") pursuant to which defendant agreed to provide "vertical vehicle conveyances" for use in connection with an amusement park ride known as the "Tower of Terror."  Defendant in turn entered into two purchase agreements with plaintiff to supply parts to be used by defendant during construction. Pursuant to purchase order 447388, plaintiff agreed to provide defendant with three elevator cabs, and pursuant to purchase order 447471, plaintiff agreed to provide customized elevator entrances.[1]  Various disputes arose under the purchase orders and, during the fall of 2003, the parties engaged in efforts to resolve their differences. On November 11, 2003, defendant sent plaintiff an e-mail, along with a document entitled "Tower of Terror–Tyler Settlement," which provides as follows,

> Please find attached the settlement agreed to for Tower of Terror.  We will release $65,000 immediately from the $80,000 we were holding and close the matter.

It appears that additional disputes arose after defendant sent this correspondence and, ultimately, defendant did not remit the $65,000 to plaintiff.[2]  In addition, Disney was unhappy

---

[1]     In its counterclaim, defendant asserts it is owed money in relation to purchase orders unrelated to the Tower of Terror project. Because neither party seeks summary judgment on these claims, any facts relevant to these unrelated purchase orders are not set forth in this opinion.

[2]     For ease of reference, the Court will address the specific facts relevant to each of the disputes in the context of each claim.

2

with certain aspects of the elevator components and refused to accept the products.  As a result, defendant instructed plaintiff to refabricate some of the parts.  After plaintiff made the requested changes, Disney accepted delivery.

Thereafter, plaintiff filed this lawsuit asserting two claims for relief.  In count one plaintiff asserts a claim for breach of contract.  Plaintiff alleges that the November 11th e-mail resolved the disputes between the parties with regard to purchase order 447388 and is an enforceable settlement agreement.  In count two plaintiff asserts a second claim for breach of contract with respect to purchase order 447471.  Defendant filed an amended counterclaim asserting eight claims.  Count one is a claim for breach of contract relating to purchase orders 447388 and 447471.  Counts two and three assert claims for indemnification and breach of express warranty with regard to these purchase orders.  Counts four through six assert breach of contract, indemnification and breach of express warranty with regard to purchase order 453588. Counts seven and eight assert breach of contract and indemnification with regard to purchase order 471449.  Plaintiff moves for summary  judgment on count one of its complaint and counts one, two and three of defendant's counterclaim.  Defendant opposes the motion.  Defendant moves for summary judgment on count two of plaintiff's complaint.  Plaintiff opposes defendant's motion.

### STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the

3

absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrates
> the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleadings, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

**ANALYSIS**

Plaintiff's Motion for Summary Judgment

1.	Count one (complaint)

Plaintiff moves for summary judgment on count one of its complaint, in which plaintiff alleges that the parties reached a settlement agreement with regard to all "cab" issues. Plaintiff claims that the e-mail in which defendant agreed to pay $65,000 to resolve all issues constitutes an enforceable settlement agreement. Defendant argues that the agreement is not enforceable because there is no meeting of the minds with regard to the essential terms. According to defendant, it withdrew its offer upon learning that additional problems existed with regard to the elevator components provided by plaintiff.

In its brief, plaintiff points out that the parties exchanged correspondence over a period of weeks regarding various disputes concerning the Tower of Terror project. On October 24, 2003, plaintiff sent defendant a "claim resolution chart" along with the following cover letter,

> You will find my analyses of the problems and my proposal for the settlement of the case. As you can see I recognize full responsibilities (sic) for Tyler for some of the issue (sic) but I also would like to propose to split the charge 50-50 on a few of the issues as I do not feel that Tyler should be hold (sic) solely responsible for problems.

The chart attached to the cover letter included a list of 12 disputes. Defendant responded via email along with an attached chart. In the email, defendant indicates that its chart constitutes the "settlement agreed to for Tower of Terror." The attached chart contains a resolution of 11 issues.[3] Defendant further agreed to release $65,000 to "close the matter."

According to defendant, there was no meeting of the minds as to the essential terms. Defendant provides the affidavit of Pierre Gougeon, who authored the email on behalf of defendant. He avers that he intended that the settlement would resolve any and all disputes

---

[3]     Although plaintiff claims that both charts contain only 11 issues, the chart plaintiff initially sent to defendant contains 12 items. The category "head jamb sag," although identified in plaintiff's chart, is omitted from the chart attached to defendant's email.

5

between the parties regarding construction of the cabs and entrances.  In addition, he avers that

at the time he believed there were no additional problems with the construction.

"An enforceable contract may be created where there is an offer by one side, acceptance

on the part of the other, and a meeting of the minds as to the essential terms of the agreement."

*McCarthy, Lebit, Crystal & Haiman Co. v. First Union Management, Inc.*, 622 N.E.2d 1093,

1097-98 (Ohio Ct. App. 8th Dist. 1993).  In order to form a valid contract, the parties "must have

a distinct and common intention which is communicated by each party to the other."  *Id*. at 1098.

The Ohio Supreme Court has defined the elements of a contract as follows:

> 'A contract is generally defined as a promise, or a set of promises, actionable upon breach.  Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration.'

*Kostelnick v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome,*

*Inc.,* 436 F.Supp. 409, 414 (N.D. Ohio 1976)).  To prove the existence of a contract, a plaintiff

must show that there was a "meeting of the minds" and that the contract was definite as to its

essential terms.  *Id. See also Nilavar v. Osborn*, 711 N.E.2d 726, 732 (Ohio Ct. App. 2nd Dist.

1998).

In ascertaining whether there is a meeting of the minds, courts must focus on the

objective manifestations of the parties.  Courts presume that the element "meeting of the minds"

is satisfied where the party enforcing the contract can point to a written and signed agreement

that is clear and unambiguous.  "Ordinarily, one of full age in possession of his faculties and able

to read and write, who signs an instrument and remains acquiescent to its operative effect" is

bound by the terms set forth therein.  *See Cuyahoga Cty. Hospitals v. Price*, 581 N.E.2d 1125,

1128 (Ohio Ct. App. 8th Dist. 1989) (*quoting Kroeger v. Brody*, 200 N.E. 836, 839 (Ohio 1936)).

6

Ohio courts have further noted that, while the interpretation of the terms of a contract is undertaken as a matter of law, the existence of a contract is a question for the trier of fact. *Gruenspan v. Seitz*, 705 N.E.2d 1255, 1264 (Ohio Ct. App. 8th Dist. 1997). *See also Oglebay Norton Co. v. Armco, Inc.*, 556 N.E.2d 515, 519 (Ohio 1990) (holding that "[w]hether the parties intended to be bound . . . is a question of fact properly resolved by the trier of fact"); *PHD, Inc. v. Coast Business Credit*, 147 F.Supp.2d 809, 820 (N.D.Ohio 1997) (applying Ohio law, holding that "[w]hether or not a contract exists is a question of fact"). Only in the clearest cases should a court decide as a matter of law whether the parties intended a contract. *Arnold Palmer Golf Co. v. Fiqua Industries, Inc.*, 541 F.2d 584, 588 (6th Cir. 1976) (applying Ohio law).

Upon review, the Court finds that plaintiff is entitled to summary judgment because a valid enforceable settlement agreement exists with regard to the eleven issues identified in the chart attached to the email sent by defendant to plaintiff. As an initial mater, the email expressly identifies that the document is an "agreed" settlement. In addition, the parties negotiated and discussed specific details regarding the resolution of the disputed issues. The Court rejects defendant's argument that there is no meeting of the minds because defendant believed that the settlement included an understanding that no further problems would arise or that the agreement resolved any and all disputes related to the project. There is simply no language in the agreement addressing any issues other than those specifically identified in the chart. Because the document is clear and unambiguous, the Court cannot rely on extrinsic evidence in ascertaining whether a contract exists. Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement. *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999). As such, defendant's

7

subjective belief as to scope of the settlement is irrelevant.

The Court further rejects defendant's argument that it withdrew the settlement upon learning that additional problems existed with the entrances.  In support of its position, defendant points to the testimony of Gougeon, who avers that he "withdrew the...settlement because [plaintiff's] multiple breaches of its contract with [defendant], reflect inconsistent understandings as to the essential terms of the...agreement."  As plaintiff points out, however, this testimony directly contradicts Gougeon's deposition testimony, in which he testified as follows,

> Q:     Who made the decision to withhold the $65,000 payment?
>
> A:     John Lukens.
>
> Q:     On what basis?
>
> A:     You'd have to talk to him about his reasoning.
>
> Q:     He instructed you not to pay?  Tell me what he told you.
>
> A:     Well, in fact, he didn't instruct me.  He instructed our finance department not to release the money, so he went directly to our financial manager, which is Jim Smooch, to say we are not releasing it.
>
> Q:     Did you have any discussions with Mr. Lukens concerning this settlement agreement?
>
> A:     No.  He made the decision himself.
>
> Q:     He made the decision not to release the payment to [plaintiff]?
>
> A:     That's right.

Gougeon expressly testified that John Lukens made the decision not to pay the agreed settlement amount and that the two had no discussion regarding the decision not to make the settlement payment.  Contrary to defendant's argument, the Court finds that this testimony

8

directly conflicts with the Gougeon's affidavit, in which he now purports to testify that *he* withdrew the settlement because of inconsistent understandings as to the essential terms of the agreement.  It is well settled that a party may not introduce an affidavit that contradicts earlier sworn testimony.  *See, e.g., Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Accordingly, the Court will not consider Gougeon's affidavit.  Defendant presents no additional evidence regarding the withdrawal of the settlement agreement and, accordingly, this argument is rejected.[4]

Defendant also argues that there was no meeting of the minds because there is evidence that the settlement agreement encompasses both cab and entrance related issues.  Defendant claims that because plaintiff's construction of the agreement is belied by the testimony and the face of the document itself, no enforceable agreement exists.  While defendant correctly notes that plaintiff initially[5] argued that the agreement resolved "cab" issues, plaintiff later indicates that a settlement agreement exists for the eleven specific issues set forth in the chart regardless of whether they are cab or entrance related.  Upon review, the Court rejects defendant's argument. Regardless of what each party claims the contract means, the Court finds that, as a matter of law, the terms set forth in the document are clear and unambiguous.  Thus, this Court must apply the

---

[4]     The Court is not convinced that defendant could "withdraw" the settlement agreement in any event.  Plaintiff, however, does not make this argument and, as such, the Court will not address this issue.

[5]     In addition, the Court notes that count one of the complaint alleges that the settlement agreement resolved all "cab" issues in exchange for $65,000.  This Court, however, must liberally construe the pleadings.  Given that plaintiff alleges that a settlement agreement was reached, the Court finds that plaintiff's claim can be read to encompass this Court's conclusion.

9

terms of the agreement as written. *See, e.g.*, *Gencorp,* 178 F.3d at 817-18 ("[I]f the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted."). Moreover, plaintiff does not rest on its initial assertion that the settlement agreement resolves only cab-related issues.  The Court finds that the language set forth in the email and chart sent by defendant is clear and unambiguous.  As a result, the meeting of the minds element is satisfied and defendant's argument to the contrary is rejected.

       2.      Count one (counterclaim)

In count one of its counterclaim, defendant asserts a breach of contract claim based on plaintiff's alleged failure to properly construct both the cabs and entrances.  Each will be addressed in turn.

       a.      Cabs

Plaintiff moves for summary  judgment on the grounds that the purported settlement agreement covers any alleged breach of contract based on improper welding.  In its opposition brief, defendant fails to address welding in any fashion.  Rather, in connection with count one of the counterclaim, defendant's arguments are limited to service life and wind load as they relate to the entrances.  As such, the Court finds that defendant abandoned its claim that plaintiff breached the agreement by failing to properly weld the cabs.

       b.      Entrances

Plaintiff moves for summary judgment on the grounds that no contractual provision requires the doors to withstand winds of up to 20 pounds per square foot ("wind load requirement").  In addition, plaintiff argues that defendant fails to offer any expert testimony supporting its position that the doors failed to comply with the minimum service life

requirements.  According to plaintiff, although defendant acquiesced to Disney's concerns regarding the service life requirement, there is simply no evidence that the doors would not have satsified this contractual provision.  Defendant argues that certain terms, which were incorporated by reference into the purchase order, required plaintiff to construct doors with a the wind load requirement.  In addition, defendant claims that there is ample evidence supporting its position that the doors constructed by plaintiff failed to satisfy the minimum service life requirement.

Plaintiff argues that there is no contractual provision or other document calling for a 20 pounds per square foot wind load requirement.  As such, plaintiff did not breach the parties' contract by constructing doors that fail to meet this standard.  According to defendant, the following contractual provisions[6] bind plaintiff to the wind load and service life requirements,

1.2    Scope.

This document specifies the...requirements for the design...of the horizontal sliding doors.  ...[T]he door designs for the Tower of Terror II shall be essentially the same as those provided by Contractor for the original [Florida] WDW Tower of Terror[7] attraction. The Contractor's scope for the Tower of Terror II doors shall include, as detailed in this document, some components provided by the Owner on the WDW attraction, as well as some required improvements....

3.4    Quality and Overall Performance Constraints.

The Contractor shall provide materials and components at industry recognized quality levels, which are in no case lower than the level of quality provided for the WDW Tower

_____

[6]    The provisions are set forth in the "prime contract" between defendant and Disney.  The purchase orders incorporate by reference the "General Terms and Conditions Form #3406," which in turn incorporates the prime contract.

[7]    Similar products were manufactured for Disney at its Florida amusement park.

11

of Terror attraction.

4.1.1   Panel Construction

Door panels shall be hollow with stainless steel skins and internal stainless steel ribs of the same dimensions/gages in construction used on the doors for the WDW Tower of Terror attraction.  The Contractor shall investigate reported fatigue indications in the door hanger/header structure at WDW and make changes as required to meet the service life requirements.

According to defendant, the doors produced by plaintiff visibly flexed outward and inward during operation.  It appears that defendant claims that, as a result of the deflection, the doors would not have satisfied the wind load and service life requirements.

This Court previously set forth the law pertaining to contract formation.  To succeed on a breach of contract claim under Ohio law, plaintiff must prove "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio 1994).  In this case, the parties dispute whether plaintiff was contractually obligated to construct the door panels with a 20 pound per square foot wind load.  In addition, the parties dispute whether defendant can establish a breach of the service life provision absent the introduction of expert testimony.  Each issue will be addressed in turn.

A. Wind load

With regard to the wind load requirement, plaintiff argues that no document, specification, drawing or change order identifies a wind load requirement for the door panels.  As such, plaintiff was not contractually obligated to satisfy this standard.  In response, defendant fails to point to a specific provision outlining the need for a 20 pound per square foot wind load requirement.  Instead, defendant points to the following evidence in support of its position that

12

the requirement exists,

- Plaintiff failed to review the specifications, yet was aware such documentation existed;

- In a May 21, 2002, meeting, Disney communicated the need for a 20 pounds per square foot wind load requirement;

- Plaintiff knew of the wind load requirement, yet ignored Disney's demand;

- Disney investigated the Florida doors and concluded that the wind load condition at that location amounted to 20 pounds per square foot.

Upon review, the Court finds that plaintiff is entitled to summary judgment.  Plaintiff correctly notes that there is no express provision setting forth a wind load requirement and defendant fails to point to a specification outlining such a requirement.  Thus, whether plaintiff ever reviewed the specifications is irrelevant.

Next, defendant claims that plaintiff learned of the wind load requirement set out by Disney at the May 21st meeting. In support of its position, defendant relies on the affidavit of Pierre Gougeon and an email sent from Disney to defendant, which defendant then forwarded to plaintiff.  According to plaintiff, the affidavit of Pierre Gougeon, who admittedly was not in attendance, is not admissible to prove what transpired at the meeting.  This Court agrees.  Any information provided by Gougeon constitutes inadmissible hearsay and is not based on personal knowledge.  Therefore, the Court will not consider the portion of Gougeon's affidavit in which he purports to testify that the wind load requirement was discussed at the May 21st meeting.

The email relied on by defendant provides as follows,

[Plaintiff,]

Mark Sumner for Disney has indicated he wants the following condition also included in the documentation that [you] will provide to verify that the doors meet seismic loads. The exterior doors are the 12' x 7' doors.

13

I have been out of the office for several day (sic), so I am not sure if we still owe you information on the doors.  Please let me know.

[Defendant]

Along with this email, defendant forwarded the following email received from Disney,

[Defendant,]

During the last design review, we discussed documenting the seismic loads on the VVC doors to show that the door design is adequate for the imposed loads.

In addition, I believe we must also address wind load conditions on the exterior door panels.  The required design load for the doors in these locations is 20 lb/sq. ft.

It appears that the wind loads will not be an issue, as the per panel load will be about 420 lb., and I understand that the per panel design criteria is 500+ lg.

Please include the wind load case for the exterior doors in your design documentation.

Thanks.

[Disney]

Upon review, the Court finds that, viewing this email in the light most favorable to defendant, it does not create a question of fact as to whether plaintiff was contractually obligated to incorporate a specific wind load requirement into the design of the doors.  The email sent by defendant to plaintiff discusses only documentation issues regarding the seismic load.  While the forwarded email discusses the wind load requirement "in addition" to the seismic load documentation, defendant's email to plaintiff does not address wind load in any fashion.  Moreover, Scott Warner, who authored the email on behalf of defendant, testified that he did not recall ever discussing a wind load requirement with plaintiff.[8]

---

[8]     Defendant points to handwritten notations made by plaintiff's project manager, which indicated that plaintiff will "ignore" the wind load requirement sought by Disney.  This notation, however,

Assuming *arguendo* that the email could be read to inform plaintiff of a wind load requirement, plaintiff is nonetheless entitled to summary judgment.  Defendant fails to point to any evidence or present any argument as to how plaintiff would be bound to any additional post-contractual terms.  In passing, defendant points to the following provision,

> The Contractor's scope for the Tower of Terror II doors shall include, as detailed in this document, some components provided by the Owner on the WDW attraction, as well as some required improvements identified and/or incorporated by Disney since the delivery of the [Florida doors].

Reading this provision in the light most favorable to defendant[9], Disney possessed the authority to identify "improvements" to be included in the finished product even after the parties signed the agreement.  To the extent defendant is claiming that the wind load is an after-the-fact improvement identified by Disney, the argument is rejected.  On its face, the provision applies only to improvements. Thus, to the extent the wind load is not an improvement over the Florida entrances, the provision is inapplicable.  Defendant, however, fails to provide any evidence or argument that the wind load is an improvement over the Florida doors.  In fact, as set forth below, defendant expressly argues that the wind load requirement is not an improvement.  Because defendant fails to point to any evidence suggesting that the wind load requirement is an improvement, the Court finds that the provision is inapplicable to this issue.  Defendant points to

_____

> does nothing to alleviate defendant's primary problem, i.e., defendant fails to present any argument or point to any evidence suggesting that plaintiff is contractually bound to any wind load requirement.

[9]     It is slightly unclear from the provision whether any required improvement must also be "detailed in the document," or whether this phrase modifies only the "components" provided by defendant.

no other provision allowing for post-contractual changes to the parties' agreement. Accordingly, defendant's argument is rejected.

Defendant attempts to argue that plaintiff is contractually bound to the wind load term because the parties' agreement requires plaintiff to construct doors with a quality level equal to those in Florida. According to defendant, the entrances at the Florida attraction have a wind load requirement of 20 pounds per square foot. Defendant, however, fails to point to any specification, drawing or contract term in connection with the Florida project setting forth a minimum wind load. The only evidence relied on by defendant to establish the wind load at the Florida attraction are tests performed by Disney. It is beyond dispute that this type of evidence would constitute expert testimony in that it involves "scientific, technical or other specialized knowledge." *See* Fed.R.Evid. 702. Yet, defendant has not demonstrated that the individual performing these tests is qualified to testify as an expert. As such, there is simply no admissible evidence that the Florida attraction possesses a 20 pounds per square foot wind load. Absent such evidence, plaintiff is entitled to summary judgment.

B.    Service life

The parties do not dispute that the contract requires plaintiff to construct doors with a minimum service life of 20 years. According to plaintiff, defendant cannot prove that the 20-year service life provision was breached absent the introduction of expert testimony. Since defendant has not offered any expert testimony, plaintiff claims that it is entitled to summary judgment. Defendant argues that plaintiff admitted that its doors do not correspond to the engineering drawings and are "too weak" compared to the Florida doors. As such, defendant claims that genuine issues of material fact preclude summary judgment on this aspect of its

16

breach of contract claim.

Upon review, the Court finds that the testimony and documentary evidence relied on by defendant is sufficient to create a question of fact.  Ricardo Ferrari, one of plaintiff's employees, sent the following email to defendant,

> Unfortunately, it seems that, for whatever reason, our manufacturing has produced doors that do not correspond to the engineering drawings.  I apologize for the inconvenience and I would like you to know that we are going to undertake internal measures to make sure that things like this will not happen again.

When asked at deposition about this email, Ferrari testified that, at the time he wrote the email, he had been told that doors were too weak to "make it."  He further testified that the doors were too weak compared to the Disney specification.  Although plaintiff points out that Ferrari later testified that his email was "impulsive" and that he doesn't have the expertise to make such conclusions, the Court finds that the evidence relied on by defendant is sufficient to create a question of fact with regard to the service life.  Although as a general rule, expert testimony would be required to establish this type of breach, in this case there is evidence that plaintiff expressly admitted a breach of the service life provision.  Ferrari indicated in an email that the doors were not constructed in accordance with the engineering drawings and testified that this conclusion came as a result of indications that the doors were too weak to "make it."  He further testified that the doors were "too weak" if compared to the Disney specification.  Even though Ferrari attempted to "explain" his "impulsive" email, the Court finds that a juror could reasonably conclude, even absent expert testimony, that plaintiff breached the service life provision in the contract.

3.      Counts two and three (counterclaim)

In counts two and three of its counterclaim, defendant asserts claims for indemnification

17

and breach of express warranty.  Plaintiff argues that, to the extent it is entitled to summary judgment with respect to count one of the counterclaim, summary  judgment must be granted in its favor with respect to counts two and three.  Having concluded that a question of fact exists with regard to the alleged breach of the service life provision, the Court finds that summary judgment on counts two and three would be improper.

<u>Defendant's Motion for Summary Judgment</u>

In count two, plaintiff alleges that it reconstructed the entrances after Disney concluded that the entrances were unsatisfactory.  Plaintiff seeks additional compensation in the amount of approximately $66,000 for this "extra" work.  Defendant argues that it is entitled to summary judgment with respect to count two because the purchase order requires any modification to the price to be in writing and no such written document exists.  Plaintiff claims that the contract does not require that changes be made in writing.

The parties' agreement contains the following provision,

Any term or condition stated by Seller in any prior proposal or in acknowledging or otherwise accepting this order shall not be binding on Buyer unless specifically accepted by Buyer in writing.  Buyer will not be bound to any prices or delivery to which it has not specifically agreed in writing.

Defendant argues that this provision prevents plaintiff from recovering for any costs associated with reconfiguring the doors because defendant never agreed to the additional costs in writing.  Plaintiff argues that this provision is simply a "merger clause," incorporating all prior quotes and negotiations into the terms of the purchase order.  According to plaintiff, there is no provision requiring "change orders" to be in writing.

"The question of whether the language of an agreement is ambiguous is a question of law." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (*citing Parrett v. Am. Ship*

18

*Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)).  Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement.  *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999).  "[I]f the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted."  *Id*.  "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered to give effect to the parties' intentions."  *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992).  Under Ohio law, common words appearing in the contract "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."  *Id*.  (internal quotation and citation omitted).

Upon review, the Court finds that the language cited by defendant is clear and unambiguous.  On its face, the provision provides that defendant will not be bound to any price not agreed to in writing.  The Court rejects plaintiff's argument that the term is simply a merger clause.  It appears that plaintiff is claiming that the term relates solely to pre-contractual bids and negotiations and cannot be read as broadly as defendant urges.   While the first sentence in the term applies only to negotiations leading up to the consummation of the contract, the second sentence is not so limited.  To accept plaintiff's proposed construction would render the second sentence entirely meaningless since the first sentence would preclude consideration of precontractual negotiations in any event.  Courts, however, must strive to interpret contracts in a manner that gives each phrase a meaning. *Affiliated FM Ins. Co. v. Owens-Corning Fiberglas Corp.*, 16 F.3d 684, 686 (6th Cir. 1994); *Prudential Ins. Co. v. Corporate Circle*, 658 N.E.2d

19

1066, 1069 (1995).  Because plaintiff's proffered construction would render the second sentence

in the provision meaningless, plaintiff's argument is rejected.

Plaintiff argues, however, that Ohio law recognizes that a party may waive enforcement

of a provision requiring written amendments to a contract.  *Frantz v. Van Gunten*, 521 N.E.2d

506, 510 (Oh. Ct. App. 3rd Dist. 1987).  "This rule is peculiarly just when applied to building

contracts, when changes are made, the necessity of which develops as the work progresses and

while the parties are intent on the accomplishment of the undertaking...."  *Id*.  A wavier,

however, must be established by clear and convincing evidence that alterations have been made

with the knowledge of all parties.  *Id*.  Thus, in order to avoid summary judgment, this Court

must determine whether, based on the evidence presented, a reasonable juror could conclude that

plaintiff waived the provision by clear and convincing evidence.

After viewing the evidence presented by the parties, the Court finds that plaintiff fails to

present sufficient evidence from which a jury could conclude that defendant waived its right to

enforce the provision.  Although plaintiff points out that defendant instructed plaintiff to

refabricate the doors, there is no evidence that the parties discussed either the anticipated cost of

the refabrication or which party would pay for the work. [10]  The Court finds that defendant's

instruction alone is insufficient evidence on which a jury could conclude by clear and convincing

evidence that defendant waived the provision.  This is especially so in light of the fact that the

provision at issue anticipates that any changes to *prices* must be in writing.  Given the lack of

---

[10]     The Court rejects plaintiff's theory that a "constructive change
order" exists in this case.  While plaintiff correctly notes that Ohio
courts have recognized this doctrine, it appears applicable only in
the context of public works contracts.

20

evidence regarding even an oral discussion of the price term for the additional work, the Court finds that defendant is entitled to summary judgment.

In count two, plaintiff alleges that it is entitled to the costs associated with refabricating the doors based on a theory of unjust enrichment.  Defendant argues that plaintiff cannot succeed on this theory because an express contract exists governing the same subject matter.  This Court agrees with defendant.  It is well settled that a party may not recover in quasi-contract in the face of an express contract governing the same subject matter.  *Ullmann v. May*, 72 N.E.2d 63 (Ohio 1947), *paragraph four of the syllabus. See also Joseph Oldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc.*, 1995 WL 276804 (Ohio App. 2nd Dist. May 10, 1995) (citing *Williams v. Goodyear Aircraft Corp.*, 85 N.E.2d 601 (Ohio App. 9th Dist. 1948)); *City of Cincinnati v. Cincinnati Reds*, 483 N.E.2d 1181 (Ohio App. 1st Dist. 1984)); *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975). In this case, the parties' agreement specifically addressed changes to the pricing term.  In light of this provision, plaintiff cannot fall back on a theory of unjust enrichment after failing to obtain defendant's written agreement to pay for the cost of the extra work it performed.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Sematic USA, Inc. d/b/a Tyler Elevator Products' Motion for Summary Judgment is GRANTED in PART and DENIED in PART and  Defendant Otis Elevator Company's Motion for Partial Summary Judgment is GRANTED.

IT IS SO ORDERED.


/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 6/6/06